**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PAUL MCLEOD, on behalf of himself and all others similarly situated, <br><br>            Plaintiff, <br><br>     v. <br><br> AU10TIX LTD., <br><br>            Defendant. | Case No. 1:24-cv-08122 <br><br> Honorable LaShonda A. Hunt <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

<u>**FIRST AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiff Paul McLeod ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for violations of 625 ILCS 5/6-117.1 (the "Illinois Driver's License Act" or "IDLA") and 740 ILCS 14/1 *et seq.* (the "Illinois Biometric Information Privacy Act" or "BIPA") against Defendant Au10tix Ltd. ("Au10tix" or "Defendant"). Plaintiff makes the following allegations pursuant to his counsel's investigation and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

<u>**NATURE OF ACTION**</u>

1. Au10tix is a software-as-a-service provider that helps "the world's largest brands" – spanning numerous industries[1] – to, *inter alia*, verify people's identities and ages across clients' websites (through, *inter alia*, the Au10tix WebView SDK) and Android and iOS applications (through, *inter alia*, the Au10tix Mobile SDK).[2] Au10tix does so using a photo-

---

[1] https://www.au10tix.com/industries/.

[2] https://www.au10tix.com/wp-content/uploads/2021/12/AU10TIX-EULA-January-2024-Final.pdf.

1

based identity document, a selfie, and machine learning and/or artificial intelligence algorithms.[3]

2.      The process is simple: "The user submits their identification document and ... take[s] a selfie."[4]  Next, "[t]he submitted ID is scanned and analyzed to verify its authenticity[, as Defendant's] technology checks for various security features and compares the information on the document against trusted databases."[5]  After that, Defendant completes a "Biometric Comparison: Facial recognition technology compares the user's selfie to the photo on the ID. This step ensures that the person holding the ID is the same person in the selfie."[6]  Finally, there is a "Verification Outcome: The system provides a result indicating whether the verification was successful or if further action is required. The system can request additional information or flag the account for manual review if discrepancies are found."[7]

3.      Au10tix thus uses information[8] obtained from Illinois driver's licenses ("Information") to "identify or prove the age of the holder of the license, or in the course of [] commercial transaction[s]" (i.e., onboarding, authentication, identification, and/or age verification).  *See* 625 ILCS 5/6-117.1(a).  Such use is in compliance with the law, and Plaintiff does not challenge it.

4.      However, Defendant runs afoul of the IDLA because Defendant uses Information not only for the discrete onboarding, authentication, identification, and/or age verification

---

[3] https://www.au10tix.com/blog/what-is-digital-identity-verification-and-how-does-it-work/.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] Readable text on the face of the license and information encoded or encrypted into a bar code, magnetic strip, or other electronically readable device on or in the license.

transactions of particular Illinois driver's license holders ("Information Class Members"), but also for a separate, undisclosed reason: to improve Au10tix's own products and services. Specifically, Defendant utilizes Information Class Members' Information as "training data"[9] for its machine learning and/or artificial intelligence algorithms – a use for which Information Class Members did not give their express permission, and a use allowing Defendant to realize significant cost-savings.[10]

5. The IDLA prohibits such use, stating: "Information obtained … may not be used for purposes unrelated to the transaction in which it was obtained[.]" 625 ILCS 5/6-117.1(a).

6. Defendant's illegal conduct does not stop there. Through the same process, Defendant has collected, captured, or otherwise obtained the face geometry and associated biometric information of thousands of Illinois residents ("Biometrics Class Members"). While completing "ID Verification"; "Age Verification"; and "Liveness detection"[11] on behalf of clients, Au10tix completes a "Biometric Comparison: Facial recognition technology [that] compares the user's selfie to the photo on the ID [document provided]. This step ensures that the person holding the ID is the same person in the selfie."[12]

7. In direct violation of BIPA § 15(b), Defendant engaged in this collection, capture, or obtainment of Plaintiff's and Biometrics Class Members' biometric identifiers[13] and biometric

---

[9] *See* https://learn.g2.com/training-data ("[T]raining data builds the machine learning model. It teaches what the expected output looks like. The model analyzes the dataset repeatedly to deeply understand its characteristics and adjust itself for better performance.").

[10] *See* https://hackernoon.com/machine-learning-costs-price-factors-and-real-world-estimates ("[A] study by Dimensional Research shows that, on average, ML projects need around 100,000 data samples to perform well. … Generating 100,000 data points via Amazon's Mechanical Turk, for example, can cost you around $70,000.").

[11] https://www.au10tix.com/.

[12] *Id.*

[13] A "biometric identifier" is any personal feature that is unique to an individual, including but not limited to fingerprints, iris scans, DNA, and scans of "face geometry." 740 ILCS 14/10.

information[14] (referred to collectively, as "biometrics") **without** first receiving written consent from Plaintiff and Biometrics Class Members for the collection of their biometric identifiers or information. *See* 740 ILCS 14/15(b); 740 ILCS 14/15(b)(3).

8. Defendant's conduct was not only illegal; it was also dangerous. In June 2024, "404 Media reported that … AU10TIX[] left login credentials exposed online for more than a year, allowing access to [] very sensitive user data."[15] Specifically:[16]

> A researcher gained access to the company's logging platform, "which in turn contained links to data related to specific people who had uploaded their identity documents," including "the person's name, date of birth, nationality, identification number, and the type of document uploaded such as a drivers' license," as well as images of those identity documents.

This is precisely the type of harm against which the IDLA and BIPA are meant to protect.

9. Thus, Plaintiff brings this action to prevent Defendant from further violating the privacy rights of Illinois residents, and to recover statutory damages for Defendant's unauthorized use, collection, capture, and/or obtainment of these individuals' data (biometric or otherwise), in violation of the foregoing statutes.

---

[14] "Biometric information" is any information that is captured, converted, stored, or shared based on a person's biometric identifier and used to identify an individual. *Id.*

[15] https://www.eff.org/deeplinks/2024/06/hack-age-verification-company-shows-privacy-danger-social-media-laws. See also https://www.404media.co/id-verification-service-for-tiktok-uber-x-exposed-driver-licenses-au10tix/; https://9to5mac.com/2024/06/27/identity-verification-company-au10tix/ ("If there's one type of company you definitely don't want to see left vulnerable to hackers it's an identity verification service with access to photo ID documents like driver's licenses – but that's exactly what appears to have happened with AU10TIX. … The company claims that no personal data was obtained, but given that the credentials were shared in Telegram channels used by hackers, and have worked for more than a year, this seems questionable."); https://www.engadget.com/an-id-verification-service-that-works-with-tiktok-and-x-left-its-credentials-wide-open-for-a-year-171258438.html ("'My personal reading of this situation is that an ID Verification service provider was entrusted with people's identities and it failed to implement simple measures to protect people's identities and sensitive ID documents,' Mossab Hussein, the chief security officer at cybersecurity firm spiderSilk who originally noticed the exposed credentials, said.").

[16] *Id.*

4

**PARTIES**

10.     Plaintiff Paul McLeod is, and has been at all relevant times, a resident of Homewood, Illinois, in Cook County.  While in Illinois, in or around March 2020, Plaintiff uploaded photographs of his Illinois driver's license and his face, via Defendant's software.

11.     Plaintiff McLeod provided his driver's license for a discrete onboarding, authentication, identification, and/or age verification transaction – specifically, to become an "Identity Verified" member of Fiverr (one of Defendant's many clients).  After the Information obtained from Plaintiff's license was used to identify him, the course of his commercial transaction was complete.  Nonetheless, Defendant used Plaintiff's Information for purposes unrelated to the transaction in which it was obtained – improving Defendant's own products and services, by employing Plaintiff's Information as "training data" for Defendant's machine learning and/or artificial intelligence algorithms.  Au10tix never requested – nor did Plaintiff ever provide – consent to use his license for this purpose, which was wholly unrelated to his transaction.  Indeed, Defendant's product and service improvement was neither necessary nor required for Plaintiff McLeod's discrete transaction whatsoever.

12.     Plaintiff McLeod also had his face geometry and related biometric information captured, collected, or otherwise obtained by Au10tix as it scanned his face and created a set of biology-based measurements used to identify him.  But Defendant never requested – nor did Plaintiff ever provide – written consent for Defendant's collection of his biometrics.

13.     Defendant Au10tix Ltd. is an Israeli limited company with its principal place of business at 5 Hanagar St., Hod Hasharon, Israel 4501307.

**JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5

1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

15. This Court has personal jurisdiction over Defendant for several reasons.

16. First, Defendant has established a regular business presence in Illinois, including multiple business relationships with Illinois-based entities. Among Au10tix's Illinois clients is Just Eat Takeaway.com,[17] which has its North American headquarters in Chicago[18] and is the owner[19] of Chicago-based[20] Grubhub. Defendant also sells[21] its software through the marketplace of Chicago-based[22] G2.com. And there is an ongoing partnership between "Thomson Reuters CLEAR ID Confirm and AU10TIX[.]"[23] Thomson Reuters "CLEAR is a powerful investigative platform that … help[s] provide actionable insights to law

---

[17] *See* https://www.au10tix.com/landing/idv-1/ ("AU10TIX is trusted by the world's leading brands every day … JUST EAT"); https://42matters.com/sdks/android/au10tix ("Au10tix[.] Apps that use this SDK: … Just Eat - Food Delivery").

[18] https://www.justeattakeaway.com/newsroom/en-WW/200970-just-eat-takeaway-com-to-combine-with-grubhub-to-create-a-leading-global-online-food-delivery-player.

[19] *See* https://about.grubhub.com/; https://www.wsj.com/articles/just-eat-takeaway-considers-putting-grubhub-up-for-sale-after-orders-fall-11650455192; https://www.justeattakeaway.com/newsroom/en-WW/200970-just-eat-takeaway-com-to-combine-with-grubhub-to-create-a-leading-global-online-food-delivery-player.

[20] https://www.dnb.com/business-directory/company-profiles.grubhub_holdings_inc.04079eb4c63239693b12a21c16a44c4f.html.

[21] *See* https://www.g2.com/sellers/au10tix; https://www.g2.com/products/au10tix/reviews#details (stating "This profile has been claimed and optimized by AU10TIX.").

[22] https://company.g2.com/about.

[23] https://legal.thomsonreuters.com/blog/how-to-detect-synthetic-identity-fraud-before-it-becomes-a-problem/. *See also* https://legal.thomsonreuters.com/en/c/identity-verification-at-every-level.

enforcement[,]"[24] including the Village of Grayslake, Illinois Police Department[25] and the Illinois State Police.[26]

17. Second, Defendant has taken direct and intentional steps to engage in business with Illinois residents, including Plaintiff. For one, Defendant consciously designed its ID verification software to be compatible with Illinois driver's licenses. Au10tix confirms that one of the first steps in its ID verification process is "classification." Au10tix describes this process as follows:[27]

> Classification: The credential is automatically classified by country **or state of issue** and by document type (for example, Passport, Driver's License, and ID Card) and version number. This is done by comparing the submission against a catalog of Format Profiles which contains detailed information about the structure and format of various ID credential types. The catalog of Format Profiles has over 17,000 samples and frequently updates. This classification enables the system to proceed with the data extraction and authentication tests. The full list of supported Format Profiles can be found on the AU10TIX documentation knowledge base (you must be a customer to have access to the knowledge base).
>
> …
>
> 2.4.1. ID Layout
>
> The credentials process validates the layout of the submitted credentials and checks against **the correct layout of that type of ID document**. The process verifies that the structure of the submitted ID **conforms to the structure and format specifications** of the Format Profile for that ID Type. This includes

---

[24] https://legal.thomsonreuters.com/en/c/clear/law-enforcement.

[25] https://www.villageofgrayslake.com/DocumentCenter/View/11881/Police-Department---CLEAR-Software-2022-2025---Executed.

[26] https://isp.illinois.gov/StaticFiles/docs/Directors/ISP%20Strategic%20Plan%20FY2023-FY2025%20-%20FY24%20Q3.pdf at p. 53 (listing "Estimated Total Cost" of "$587,880.00" for "CLEAR Software Licenses (Thomson Reuters)[.]").

[27] https://www.au10tix.com/wp-content/uploads/2024/03/AU10TIX-Credential-IDV-Policy-March-2024.pdf at p. 8. *See also* https://www.au10tix.com/wp-content/uploads/2021/12/AU10TIX-EULA-June-2024-1.pdf at p. 9 ("Classification – The ID is automatically classified by country/state of issue and by document type (e.g., Passport, Driver's License, ID Card) and version number. This is done by comparing the submission to our extensive catalog of Format Profiles which contains detailed information about the structure and format of various ID types. This classification enables the system to proceed with the data extraction and authentication tests.") (emphasis added).

elements such as fonts and text alignment.

On information and belief, Defendant made the deliberate choice to include Illinois driver's licenses in its catalogue of "Format Profiles," so that Illinois driver's licenses could be verified and/or analyzed by Au10tix's system(s).  Otherwise, Au10tix would not be able to verify and/or analyze Illinois driver's licenses as effectively or at all.

18.  Additionally, Defendant willingly completes onboarding, authentication, identification, and/or age verification transactions for individuals whom Au10tix knows to reside in Illinois, based on the addresses on said individuals' driver's licenses.  Defendant confirms that some of the next steps in its ID verification process are "Data Extraction" and "Data Verification & Screening (DVS), together with the Proof of Address (POA)[.]"  Au10tix describes these as follows:[28]

> Data Extraction: The data shown on the ID is extracted field by field using the AU10TIX OCR (Optical Character Recognition) engine. Each data element is identified separately (for example, Name, Date of Birth, Place of Birth and so on) based on the Format Profile for that ID type. This enables the execution of a wide range of tests to verify the validity of the information given in each field. AU10TIX offers an option to optimize the data extraction process by comparing the OCR results with ID information submitted by the applicant in their application form.
>
> …
>
> The Data Verification & Screening (DVS), together with the Proof of Address (POA), establishes that the ID information corresponds to external records for this person. **AU10TIX compares the ID data with issuing and authoritative sources to verify the claims on the ID**. The DVS also screens for blacklisting based on money laundering or fraud risk factors. The solution is available globally.
>
> Personal Verification: AU10TIX verifies that the identity information submitted matches the records that appear in external databases for that

---

[28] https://www.au10tix.com/wp-content/uploads/2024/03/AU10TIX-Credential-IDV-Policy-March-2024.pdf at p. 9. *See also* https://www.au10tix.com/wp-content/uploads/2021/12/AU10TIX-EULA-June-2024-1.pdf at p. 9.

identity.

Anti-Money Laundering (AML): AU10TIX checks if the identity submitted poses a risk for money laundering. AU10TIX checks both domestic and international Politically Exposed Person (PEP) lists as well as blacklists based on criminal records or problematic online activity.

Proof of Address (POA): The applicant submits a utility bill or bank statement showing their address (in addition to the ID submission). AU10TIX uses Optical Character Recognition (OCR) to extract the name and address and verifies that the name in the document matches the name shown in the ID.

Thus, Defendant uses Optical Character Recognition to extract Illinois addresses off Illinois residents' driver's licenses, and Defendant verifies that that information matches external records.

19. Defendant's employees also regularly lay eyes on users' driver's licenses, including Illinois licenses, through its "Doublecheck" service.[29] It is thus undeniable that Defendant not only knew it was transacting with Illinois residents, but that Defendant intentionally completed those transactions.

20. Further still, Defendant makes clear that it is directly targeting Illinois residents with its services through its maintenance of "Biometric Data Policy" (which Plaintiff did not see or consent to before submitting his license) explicitly directed to Illinois residents (stating, *inter alia*: "The purpose of this policy is to explain[,] … in accordance with applicable laws including, without limitation, the Illinois Biometric Information Privacy Act[,] …" and "'Biometric Data' includes 'biometric identifiers' and 'biometric information' as defined in the Illinois Biometric Information Privacy Act ('BIPA'), 740 ILCS § 14/1[ …]"). Thus, on information and belief,

---

[29] *See* https://legal.thomsonreuters.com/en/c/identity-verification-at-every-level (For those who wish to "add another level of security[,] AU10TIX DOUBLECHECK offers manual reviews by their trained personnel in sensitive situations and for verifying unclassified documents.")

9

Au10tix actively and specifically transacted with Illinois residents by manually reviewing their Illinois driver's licenses and/or other materials. And, Au10tix actively and specifically sought Illinois driver's license standards to verify Illinois residents' driver's licenses.

21. Third, the Illinois driver's licenses and face geometry scans that give rise to this lawsuit were provided to Defendant in Illinois. Defendant thus fed information obtained from Class Members' Illinois driver's licenses, as "training data," to Defendant's machine learning and/or artificial intelligence algorithms in Illinois. Defendant also captured, collected, possessed, stored, otherwise obtained, and used Illinois residents' biometrics in Illinois.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District. Plaintiff's Information was obtained and fed, as "training data," to Defendant's machine learning and/or artificial intelligence algorithms here. Plaintiff's biometrics were also captured, collected, possessed, stored, otherwise obtained, and used here.

## LEGAL AND FACTUAL BACKGROUND

### A. Overview of Au10tix

23. Defendant "use[s] artificial intelligence and machine learning to provide real-time ID verification[,] document authentication[,]"[30] and "age verification"[31] services that help clients maintain compliance with regulatory requirements (i.e., know your customer, anti-money

---

[30] https://www.au10tix.com/blog/fraud-detection-ultimate-guide-recommended-solutions/.

[31] https://www.au10tix.com/.

10

laundering, etc.),[32] deter fraud,[33] and onboard and authenticate customers.[34] Au10tix's many clients, spanning a wide range of industries,[35] have integrated Defendant's solutions (i.e., "[w]eb & mobile SDKs"; "[w]eb app"; "Au10tix app")[36] into their respective web, Android, and iOS digital offerings. Thus, Defendant's "identity intelligence supports customer due diligence and onboarding for brands like Google, PayPal[,] Uber[,]"[37] "Fiverr[,]"[38] and more.

24. Within these and other Au10tix clients' web, Android, and iOS services, Au10tix uses "information [] obtained from [] identification card[s]" and "from [] driver[s'] license[s]" to "identify or prove the age of the holder of the card, or in the course of [] commercial transaction[s.]" *See* 15 ILCS 335/14D(a); 625 ILCS 5/6-117.1(a). As part of these transactions, Au10tix also captures, collects, otherwise obtains, possesses, stores, and uses the face geometry and related biometric information of thousands of Illinois residents. These onboarding, authentication, identification, and/or age verification transactions proceed as follows.

25. An Illinois resident using an Au10tix client's website, iOS app, or Android app is first prompted by Au10tix to "[p]lease prepare your document" and "[c]apture your document[.]" He or she then submits a photo of his or her driver's license to Au10tix.

---

[32] https://www.au10tix.com/company/about-us/.

[33] *Id.*

[34] https://www.au10tix.com/blog/digital-onboarding-top-5-essential-tools/.

[35] https://www.au10tix.com/industries/.

[36] https://www.au10tix.com/products/platform/.

[37] https://www.au10tix.com/blog/raconteur-digital-identity-report-2021/.

[38] https://www.au10tix.com/customer-stories/au10tix-boosts-fiverrs-customer-conversion-to-over-90/.

   

26. Next, an the user takes or uploads a photo of their face.

 

27. This experience is consistent across Au10tix clients' websites, iOS apps, and Android apps. For example, the Au10tix experience on Fiverr's website looks like this:

  

28.     After a user finishes the identification and selfie capture process, Au10tix

completes "Biometric Comparison: Facial recognition technology compares the user's selfie to

the photo on the ID. This step ensures that the person holding the ID is the same person in the



selfie."[39] Finally, there is a "Verification Outcome: The system provides a result indicating

whether the verification was successful or if further action is required. The system can request

additional information or flag the account for manual review if discrepancies are found."[40]

29.     Defendant's ID verification process can be summarized, in Defendant's own

_____

[39] https://www.au10tix.com/blog/what-is-digital-identity-verification-and-how-does-it-work/.

[40] *Id.*

words, as follows:[41]

### 2.3. Credentials Preparations

Accepted credentials undergo preparation processes before undergoing validation and verification.

- **Qualification:** Assesses if the image quality meets the minimal standards required for successful processing. It also determines whether or not the image is an ID.
- **Optimization:** The image is optimized to compensate for any deficiencies in the image quality. This involves, for example, straightening the alignment and sharpening the image.
- **Classification:** The credential is automatically classified by country or state of issue and by document type (for example, Passport, Driver's License, and ID Card) and version number. This is done by comparing the submission against a catalog of Format Profiles which contains detailed information about the structure and format of various ID credential types. The catalog of Format Profiles has over 17,000 samples and frequently updates. This classification enables the system to proceed with the data extraction and authentication tests. The full list of supported Format Profiles can be found on the AU10TIX documentation knowledge base (you must be a customer to have access to the knowledge base).
- **Data Extraction:** The data shown on the ID is extracted field by field using the AU10TIX OCR (Optical Character Recognition) engine. Each data element is identified separately (for example, Name, Date of Birth, Place of Birth and so on) based on the Format Profile for that ID type. This enables the execution of a wide range of tests to verify the validity of the information given in each field. AU10TIX offers an option to optimize the data extraction process by comparing the OCR results with ID information submitted by the applicant in their application form.

### 2.4. ID Validation

**The ID Authentication Process** establishes that the ID conforms to the layout of an official ID of the specified type and that neither the physical ID nor the submitted image has been replaced, fabricated, or altered. This ensures that all identity information shown in the ID is accurate.

---

[41] https://www.au10tix.com/wp-content/uploads/2024/03/AU10TIX-Credential-IDV-Policy-March-2024.pdf at pp. 8-12 (emphasis in original).

14

### 2.4.1. ID Layout

The credentials process validates the layout of the submitted credentials and checks against the correct layout of that type of ID document. The process verifies that the structure of the submitted ID conforms to the structure and format specifications of the Format Profile for that ID Type. This includes elements such as fonts and text alignment.

### 2.4.2. Data Integrity

AU10TIX verifies that all data is valid for the fields in which it appears. This includes validating the checksum for each numeric data element and verifying that all dates are valid and reasonable for the specified fields. It also involves ensuring that all identity data are shown in the Visual Inspection Zone (VIZ), Machine Readable Zone (MRZ), and Two-dimensional (2D Barcode) and Machine-Readable Chip (MRC) sections are identical.

### 2.4.3. Authentic Image

The credentials process validates that neither the physical ID nor the image in the uploaded credentials was fabricated or doctored. The process checks elements in the image for signs of image manipulation, the digital attributes of the files themselves, and compares them to other files to identify forgeries. The process verifies that the image was not manipulated using digital means, for example, image editing software.

### 2.5. Legitimate Actor

The credentials process validates the submission made by the person represented in the ID document by comparing the picture in the ID document with the selfie picture taken during the submission or other verified images. The process can also check the selfie for signs of manipulation.

### 2.5.1. Biometric Tests

The Biometric Tests establish that the submission is being made by a live person whose image matches the ID image and provided its consent to the Controller for biometric processing. Biometric Tests attempt to detect instances of identity theft.

### 2.5.2. Face Matching Test

The Face Matching test compares the ID photo to a selfie submitted by the customer applicant to check for similar facial features. The Face Matching

15

test consists of the following stages:

- Capturing a selfie or acquiring a facial image from a video stream (when using Mobile SDK).
- Face detection, alignment, and cropping to create an ovoid facial image.
- Normalization of portraits using the Viola-Jones method.
- Comparison of the faces which captured to the one on the ID using deep learning models.

### 2.5.3. Liveness Test

For submissions made using our AU10TIX Mobile SDK, the biometric test includes a liveness test to verify that the face-matching selfie is captured from a live person, not a static image.

The test is executed by instructing the subject to follow a randomized series of gestures. While the subject makes these gestures, the system identifies his/her face and tracks its movements to ensure that the captured face in the selfie is the same as the person making the gestures.

In the Liveness Test, AU10TIX detects:

- 3-dimensionality
- Face reflection
- Face texture
- Axial movement

### 2.6. External Validation

AU10TIX checks verified external records of living people and validates the details in the ID document correspond to verified details in the records. AU10TIX also checks that the person is not flagged as a threat or a suspect of money laundering or other fraudulent acts.

### 2.6.1. Data Verification and Screening and Proof of Address

The **Data Verification & Screening (DVS)**, together with the **Proof of Address (POA)**, establishes that the ID information corresponds to external records for this person. AU10TIX compares the ID data with issuing and authoritative sources to verify the claims on the ID. The DVS also screens for blacklisting based on money laundering or fraud risk factors. The solution is available globally.

- **Personal Verification:** AU10TIX verifies that the identity information submitted matches the records that appear in external

16

databases for that identity.

- **Anti-Money Laundering (AML):** AU10TIX checks if the identity submitted poses a risk for money laundering. AU10TIX checks both domestic and international Politically Exposed Person (PEP) lists as well as blacklists based on criminal records or problematic online activity.
- **Proof of Address (POA)**: The applicant submits a utility bill or bank statement showing their address (in addition to the ID submission). AU10TIX uses Optical Character Recognition (OCR) to extract the name and address and verifies that the name in the document matches the name shown in the ID. 2.7 Exception Management AU10TIX offers an ad hoc manual verification service to which clients can opt-in. Manual verification is performed on images lacking sufficient quality to be processed automatically.

**2.7 Exception Management**

AU10TIX offers an ad hoc manual verification service to which clients can opt-in. Manual verification is performed on images lacking sufficient quality to be processed automatically.

The manual verification service is performed by trained personnel, ensuring accurate and complete document inspection. The Exception Management service is quick and has no unsupported documents. All documents are recognized and properly classified.

The results of the manual verification service are combined with the automated verification service and made available through the same communication channels, and both raw and compiled results are returned.

The Exception Management service maintains data protection consistency with the automatic verification service. Once the agent completes the verification, the data is erased.

30. As Defendant itself puts it, Au10tix thus uses information obtained from Illinois driver's licenses ("Information") to "identify or prove the age of the holder of the license, or in the course of [] commercial transaction[s]" (i.e., onboarding, authentication, identification, and/or age verification). *See* 625 ILCS 5/6-117.1(a). The Information used by Au10tix includes all readable text on the face of the license, as depicted in the below sample from Illinois.gov:[42]



31. Moving from the top left to bottom right of the driver's license, the readable text used by Au10tix consists of the following, as well as the corresponding field identifiers (i.e., "4d" for "LIC NO"; "3" for "DOB"; "4b" for "EXP"; etc.):

- "ILLINOIS"
- Name of Secretary of State Illinois Secretary of State
- "Secretary of State"
- "DRIVER'S LICENSE"
- "USA"
- "Lic No." and license number
- "DOB" and date of birth

---

[42] https://www.illinois.gov/services/service.renew-driver.html.

- "Exp" and expiration date
- "Iss" and issue date
- Last name (here, "CUSTOMER")
- First name (here, "JANE")
- Middle name, if any (here, "SAMPLE")
- Address (here, "1234 LINCOLN AVENUE[,] SPRINGFIELD, IL 62723")
- "CLASS" and driver's license class (here, the placeholder "AEIOU")
- "END" and any endorsements (here, "NONE")
- "REST" and any restrictions (here, "NONE")
- "DONOR" designation, if applicable
- License holder's signature
- "SEX" and sex (here, "F")
- "HGT" and height (here, 5'-07")
- "WGT" and weight (here, "120 lbs")
- "EYES" and eye color (here, the placeholder "XYZ")
- "TYPE" and type of license (typically "ORG" for original and here, the placeholder "ABC")
- "VETERAN" designation, if applicable
- "DD" and Document Discriminator

32. Au10tix uses this Illinois driver's license Information for:[43]

- "Credential Preparations" – i.e., "Qualification" (assessing if the image is an ID); "Optimization" (straightening and alignment); "Classification" (classifying by state of issue, document type, and version number); and "Data Extraction" (extraction by field via optical character recognition, enabling tests to verify the validity of the information given in each field)
- "ID Validation" – i.e., processing "ID Layout" by taking into account "elements such as fonts and text alignment[]"; verifying "Data Integrity"; and checking that the physical ID and image uploaded are "Authentic Image[s]" (not fabricated or doctored)
- "External Validation" and "Data Verification and Screening and Proof of Address" – i.e., "Personal Verification" (verifying that the readable text submitted matches records in external databases); "Anti-Money Laundering (AML)" (checking if the license holder is a threat or suspect for money laundering); and "Proof of Address" (extracting name and address from the license and comparing them to other submissions).

**B. IDLA**

33. The legislative history of 625 ILCS 5/6-117.1 (the Illinois Driver's License Act,

---

[43] https://www.au10tix.com/wp-content/uploads/2024/03/AU10TIX-Credential-IDV-Policy-March-2024.pdf at pp. 8-12.

or "IDLA") – which was set out by the 94th General Assembly in SB2283 (approved by the Governor on June 20, 2006)[44] – makes clear that Defendant's conduct is violative. Per then-Illinois House of Representatives member Sara Feigenholtz, one of the co-sponsors of SB2283, the IDLA was "an initiative of Secretary of State, Jesse White's"[45] – whose "office received complaints from people who were concerned their ID information was being misused[.]"[46]

34. A press release issued by the Office of the Illinois Secretary of State on this topic makes clear: "Because the driver's license has become the most used form of identification, it is important that we take extra steps in protecting Illinois consumers. … People should feel that when they are asked to show their license or ID, that's the end of their transaction."[47]

35. Further, eight days after the Governor signed SB2283, the Office of the Illinois Secretary of State issued another press release[48], which states, *inter alia*:

> Legislation initiated by Secretary of State Jesse White aimed at preventing businesses from misusing information obtained from a patrons' Illinois driver's license and identification card was signed into law by Governor Rod Blagojevich.
>
> "I want to commend Governor Blagojevich and the members of the General Assembly for helping establish this new law that will further protect the personal information of Illinois citizens," said White. "Because the driver's license has become the most used form of identification, it is important that we take extra steps to protect Illinois consumers."
>
> … White said the new law is a necessary step in protecting the privacy of individuals who are asked to present their drivers' licenses or ID cards[.]

---

[44] https://www.ilga.gov/legislation/fulltext.asp?DocName=&SessionId=50&GA=94&DocTypeId=SB&DocNum=2283&GAID=8&LegID=22908&SpecSess=&Session=.

[45] https://www.ilga.gov/House/transcripts/Htrans94/09400015.pdf at 59. *See also* https://www.ilga.gov/Senate/transcripts/Strans94/09400044.pdf at 12.

[46] https://www.chicagotribune.com/2005/02/11/bill-would-stop-bars-from-taking-id-info/ (cleaned up).

[47] https://www.ilsos.gov/news/2005/february/050202d1.pdf (cleaned up).

[48] https://www.ilsos.gov/news/2006/june/060628d1.pdf.

36.     In recognition of these concerns about "businesses [] misusing information obtained from a patron['s] Illinois driver's license[,]" how a "driver's license [is] the most used form of identification, … [requiring] extra steps to protect[,]" and "the privacy of individuals who are asked to present their drivers' licenses or ID cards[,]" (*id.*) Illinois enacted the IDLA.

37.     The IDLA (625 ILCS 5/6-117.1) reads as follows:

(a)  When information is obtained from a driver's license to identify or prove the age of the holder of the license, or in the course of a commercial transaction, that information may be used only for purposes of identification of the individual or for completing the commercial transaction in which the information was obtained, including all subsequent payment, processing, collection, and other related actions. Information obtained from a driver's license may not be used for purposes unrelated to the transaction in which it was obtained, including, but not limited to, commercial solicitations. Information obtained from a driver's license to identify the holder of the license, or in the course of a commercial transaction, may not be sold, leased, or otherwise provided to any third party.

(b)  Any individual whose driver's license information has been used in violation of this Section has a cause of action against the person who violated this Section. Upon a finding that a violation did occur, the individual whose information was used in violation of this Section is entitled to recover actual damages, but not less than liquidated damages in the amount of $250 for each violation, plus attorney's fees and the costs of bringing the action.

(c)  Use of information contained on a driver's license is not a violation of this Section if (i) the individual whose information has been used gave express permission for that use or (ii) the information relating to the individual was obtained from a source other than the individual's driver's license.

(d)  This Section does not apply to any agency of the United States, the State of Illinois, or any other state or political subdivision thereof.

(e)  This Section does not apply to the transfer of information to a third party if (i) a federal or State law, rule, or regulation requires that the information be transferred to a third party after being recorded in specified transactions or (ii) the information is transferred to a third party for purposes of the detection or possible prosecution of criminal offenses or fraud. If information is transferred to a third party under this subsection (e), it may be used only for the purposes authorized by this subsection (e).

21

(f) This Section does not apply to the use of information obtained from a driver's license which has been provided by the holder of the license in the course of a potential or completed employment, commercial, business or professional transaction for the purpose of completing written documents including, but not limited to, contracts, agreements, purchase orders, retail installment contracts, buyer's orders, purchase contracts, repair orders, applications, disclosure forms or waiver forms.

## C.    Au10tix Violates the Illinois Driver's License Act

38.    Per the IDLA, Au10tix's use of the information obtained from drivers' licenses to "identify or prove the age of the holder of the card" ought to end at the moment Defendant ceases to act "in the course of [the] commercial transaction." 625 ILCS 5/6-117.1(a).  In this instance, the relevant transaction is the onboarding, authentication, identification, and/or age verification that Information Class Members consented to.

39.    But in clear violation of the IDLA, Au10tix uses Illinoisans' Information "for purposes unrelated to the transaction in which it was obtained[.]"  625 ILCS 5/6-117.1(a).

40.    Namely, Au10tix uses the readable text on the face of Illinois driver's licenses to improve its own products and/or services, by employing the Information as "training data" for machine learning and/or artificial intelligence algorithms.  This is confirmed by Defendant's "End User License Agreement" (last updated January 2024),[49] which states, *inter alia*:

> [Definitions]
> AU10TIX Ltd. (the "Company", "We", "Us" or "Our") …
> "Customer" means the business, legal entity or other organization that purchased the Services[.] …
> "Customer Data" means any data, information, content or material that You (and/or Your Users) submit and/or otherwise upload to the Service in the course of using the Service including personal or personally identifiable information, as such terms are defined by Data Protection Laws[.] …
>
> [Company's Representations & Warranties]

---

[49] https://www.au10tix.com/wp-content/uploads/2021/12/AU10TIX-EULA-January-2024-Final.pdf.

22

> Company (including any third parties acting on its behalf) shall use the Customer Data for the purpose of providing and improving the Services[.]
> …
>
> [Intellectual Property Rights]
>  We may utilize the information concerning Your and Your Users' use of the Service to improve Our Service. …
>
> [Updates and Service Improvement]
> Customer hereby grants the Company, subject to the Company's compliance with applicable Data Protection Laws, a license to use, reproduce, modify, create derivative works from, distribute, perform, transmit, anonymize and display the Customer Data necessary to update, develop, provide and improve the Services[.]

Likewise, a prior version of Au10tix's "End User License Agreement" (last updated September 2023)[50] largely repeats these points; Au10tix's "Data Protection Addendum" (last updated August 15, 2023)[51] states: "Au10tix and any Sub-processors may Process Customer Personal Data for the purpose of … maintaining and improving the Services and the technology used therefor"; and the Au10tix "Biometric Data Policy"[52] states: "The Company and its vendors will capture, purchase, receive, or otherwise obtain Biometric Data solely to provide, manage, maintain, improve and further develop the Company's identity and authentication services."

41.     Thus, Au10tix illegally uses theInformation for purposes (improving its own products and/or services, employing the Information as "training data" for its machine learning and/or artificial intelligence algorithms) unrelated to the transaction in which the Information was obtained (onboarding, authenticating, identifying, and/or age verifying individual Information Class Members).

---

[50] https://www.au10tix.com/wp-content/uploads/2023/09/AU10TIX-EULA-AUG-2023.pdf.

[51] https://www.au10tix.com/wp-content/uploads/2023/09/AU10TIX-DPA-EU-CPRA-Final-2023-1.pdf.

[52] https://www.au10tix.com/legal/biometric-data-policy/.

42.     Au10tix never requested – nor did Information Class Members ever provide – express consent (written or otherwise) for: Au10tix's use of the Information for purposes unrelated to the transactions in which it was obtained; Au10tix's use of the Information as "training data," specifically; or Au10tix's privacy-related policies.

43.     Defendant's conduct does not fall within any of the exceptions delineated by the Illinois Driver's License Act.

44.     Information Class Members were harmed by Defendant's unconsented use of their Information for purposes unrelated to the transactions in which the Information was obtained.  If Defendant's "training data" were to fall into the wrong hands, by data breach or otherwise, individuals to whom the Information belongs could have their identities stolen or their financial and/or other highly personal accounts breached and used for nefarious purposes.

45.     This fear is not a mere hypothetical.  In June 2024, "404 Media reported that … AU10TIX[] left login credentials exposed online for more than a year, allowing access to [] very sensitive user data."[53] This led to industry condemnation of Au10tix's business practices.  "If there's one type of company you definitely don't want to see left vulnerable to hackers it's an identity verification service with access to photo ID documents like driver's licenses – but that's exactly what appears to have happened with AU10TIX. … The company claims that no personal data was obtained, but given that the credentials were shared in Telegram channels used by hackers, and have worked for more than a year, this seems questionable."[54] "'My personal reading of this situation is that [Au10tix] was entrusted with people's identities and it failed to implement simple measures to protect people's identities and sensitive ID documents,' Mossab Hussein, the

---

[53] https://www.eff.org/deeplinks/2024/06/hack-age-verification-company-shows-privacy-danger-social-media-laws.

[54] https://9to5mac.com/2024/06/27/identity-verification-company-au10tix/

chief security officer at cybersecurity firm spiderSilk who originally noticed the exposed credentials, said."[55]

46.     Indeed, the legislative history of the IDLA makes clear that it was enacted precisely to "address[] an issue that is of epidemic proportion in this country and in Illinois regarding identity theft… [by] prohibit[ing] the use of driver's license or State ID information for purposes other than those for which it is obtained, for example proof of age."[56]

47.     Au10tix was also able to realize significant cost-savings by misappropriating the Information.[57]  The Information was therefore economically valuable.  Through Defendant's actions, Plaintiff and Information Class Members were deprived of the ability to control (i.e., protect or monetize, at their own discretion) their Information.

**D.     BIPA**

48.     The Illinois General Assembly has found that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information."  740 ILCS 14/5(c).  "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions."  *Id.*

---

[55]  https://www.engadget.com/an-id-verification-service-that-works-with-tiktok-and-x-left-its-credentials-wide-open-for-a-year-171258438.html

[56] https://www.ilga.gov/House/transcripts/Htrans94/09400015.pdf at 59 (cleaned up).

[57] *See supra* n.5 ("[O]n average, ML projects need around 100,000 data samples to perform well. … Generating 100,000 data points via Amazon's Mechanical Turk, for example, can cost you around $70,000.").

49.     In recognition of these concerns, giving rise to the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information[,]"[58] the Illinois General Assembly enacted BIPA, which provides, *inter alia*, that:

(a)     a private entity in possession of biometric identifiers or biometric information must publish a publicly available written retention schedule and guidelines for permanently destroying biometric identifiers and biometric information. *See* 740 ILCS 14/15(a).

(b)     a private entity may not collect, capture, purchase, receive through trade, or otherwise obtain an individual's biometrics unless it:

(1)     informs that person in writing that biometric identifiers or information will be collected or stored. *See* 740 ILCS 14/15(b)(1);

(2)     informs that person in writing of the specific purpose and length of term for which such biometric identifier(s) or biometric information is being collected, stored, and used. *See* 740 ILCS 14/15(b)(2); and

(3)     receives written consent from the person for the collection of his or her biometric identifiers or information. *See* 740 ILCS 14/15(b)(3).

(c)     a private entity may not sell, lease, trade, or otherwise profit from a person's biometrics. *See* 740 15/15(c).

(d)     a private entity may not disclose, redisclose, or otherwise disseminate a person's biometrics, except under certain circumstances. *See* 740 15/15(d).

(e)     a private entity must store, transmit, and protect an individual's biometric identifiers and biometric information using the standard of care for its industry and other confidential and sensitive information. *See* 740 14/15(e).

50.     BIPA defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. A "biometric identifier" includes a "scan of … face geometry." *Id.*

51.     As alleged below, Defendant's practice of collecting, capturing, and/or otherwise

---

[58] Illinois House Transcript, 2008 Reg. Sess. No. 276.

obtaining individuals' biometric identifiers (specifically, face geometry) and associated

biometric information without first obtaining informed written consent violates BIPA § 15(b)(3).

### E.     Au10tix Violates Illinois's Biometric Information Privacy Act

52.     Au10tix collects, captures, and/or otherwise obtains Illinoisans' face geometry

and related biometric information.  Once a user takes or uploads a photo of their face through an

Au10tix client's website, Android application, or iOS application, Defendant's proprietary

software extracts (collects, captures, or otherwise obtains) the user's biometric face geometry by

scanning the user's face.  Defendant's proprietary software also creates a set of biology-based

measurements used to identify the user.

53.     Indeed, Au10tix itself confirms this.  The word "biometric" appears on Au10tix's

website, in the context of describing Au10tix's services, dozens of times.[59]  Further, Au10tix

maintains a "Biometric Data Policy,"[60] (which Plaintiff did not see or consent to before

submitting his license) wherein Au10tix clarifies:

> "Biometric Data" includes "biometric identifiers" and "biometric
> information" as defined in the Illinois Biometric Information Privacy Act
> ("BIPA"), 740 ILCS § 14/1, et seq[.] …
>
> The Company and its vendors may capture, purchase, receive, or
> otherwise obtain Biometric Data in the course of providing the Company's
> products and services.
>
> The Company uses its proprietary technology to compare costumer facial
> geometry images to verify the authenticity of a person's identity

---

[59] *See, e.g.*, https://www.au10tix.com/ ("Biometric Verification[.] Unrivaled accuracy powered by NIST top-rated algorithms."); *Id.* ("Biometric Verification[.] Reduce identity theft through various biometric combinations like facial … recognition. … Estimate user age with advanced algorithms for age verification and compliance with age restriction regulations. … Detect signs of liveliness during ID verification to prevent spoof attacks, ensuring real-time video stream and evidence capture."); https://www.au10tix.com/solutions/biometric-verification/ ("Advanced biometrics with precision and integrity"); https://www.au10tix.com/blog/what-is-digital-identity-verification-and-how-does-it-work/ ("Biometric Verification: This method uses facial recognition and other biometric data to confirm a user's identity. … AU10TIX can match the face in the selfie with the photo on the ID, ensuring they are the same person.").

[60] https://www.au10tix.com/legal/biometric-data-policy/.

identification card and the identity of the person.

> The Company and its vendors will capture, purchase, receive, or otherwise obtain Biometric Data solely to provide, manage, maintain, improve and further develop the Company's identity and authentication services. Neither the Company nor its vendors will sell, lease or trade any Biometric Data that it receives from clients or from a client's customer as a result of their use of the Company's services.

> The Company's clients are responsible for their own compliance with applicable laws governing their collection, storage, use, and transmission of Biometric Data, including to obtain, in advance, a written authorization from each customer to collect, capture, purchase, receive, or otherwise obtain Biometric Data related to the customer, for the purposes described under this policy.

54. Critically, though, as described and shown in the screenshots set out *supra*, Au10tix did not, at any point during Illinoisans' interactions with it or its software, request – nor did Plaintiff or other Illinoisans ever provide – informed written consent (including to the Au10tix "Biometric Data Policy") executed by the subjects of the biometric identifiers and biometric information. *See* 740 ILCS 14/15(b)(3).

55. Au10tix's clients might **attempt** to pursue written releases concerning biometrics within said clients' respective websites, Android applications, and iOS applications. But this does not discharge or fulfill Au10tix's duty to comply with BIPA, which plainly states:

> No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless **it first**: … (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 ILCS 14/15(b); 740 ILCS 14/15(b)(3) (emphasis added). Here, the Illinois General Assembly could not have been clearer: Because Au10tix is a private entity that "collect[s], capture[s], purchase[s], receive[s] through trade, or otherwise obtain[s] a person's or a customer's biometric identifier or biometric information[,]" Au10tix (and not anybody else) was required to, first, "receive[] a written release[.]" *Id.*

28

56. To any extent that Au10tix points to its clients' attempts to pursue written releases concerning biometrics, those releases are woefully inadequate. For example, within Fiverr's identity verification process, to which Plaintiff McLeod was subjected, Fiverr merely presents the following (or substantially similar) "ID verification terms," instructing Illinoisans to "[p]lease scroll down to read the terms and make a selection to continue":

> In order to complete the ID verification process, Fiverr works with a service provider that uses automated decision-making to help verify your identity. You understand that the process requires providing Fiverr and its service provider with (i) a clear photo of you on an official government ID (from the list of accepted documents) and (ii) a clear selfie photo of your face, and consent to the use of these photos and any derived information or data contained therein (including a hashed ID card number and biometric data). The two photos will be validated for authenticity and to confirm a match. The ID image and the selfie are saved for 30 days and then deleted.

> You understand that you can decline to provide the information described above or revoke your consent at any time by notifying Fiverr in writing. Unless you are a voluntary participant in the identity verification process, declining to provide the required information or revoking your consent will result in restrictions to your account.

> You acknowledge that you have reviewed Fiverr's Privacy Policy. Read more about data protection and usage as part of the Fiverr ID verification process.

> [] I consent
> [] I do not want to continue at this time

57. At no point, here or in other Fiverr policies[61], did Fiverr so much as identify Au10tix by name, despite Au10tix being Fiverr's identity verification service provider.[62]

58. Thus, unbeknownst to the average consumer, and in direct violation of BIPA,

---

[61] https://www.fiverr.com/legal-portal/privacy/privacy-policy ("Privacy Policy" last updated April 2024); https://help.fiverr.com/hc/en-us/articles/13127850435345-Verify-your-identity ("Verify your identity"); https://help.fiverr.com/hc/en-us/articles/13127840321937-ID-verification-Data-protection-and-usage ("ID verification: Data protection and usage").

[62] https://www.au10tix.com/customer-stories/au10tix-boosts-fiverrs-customer-conversion-to-over-90/.

Defendant "collect[s], capture[s], purchase[s], receive[s] through trade, or otherwise obtain[s] a person's or a customer's biometric identifier or biometric information, [without] first: … (3) receiv[ing] a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative."  740 ILCS 14/15(b); 740 ILCS 14/15(b)(3).

59.      If Defendant's face geometry scans were to fall into the wrong hands, by data breach or otherwise, then unscrupulous entities could subvert Illinoisans' expectations of personal privacy, grossly violate their respective senses of dignity, and otherwise flout notions of common decency.  Biometrics can be used to glean copious amounts of sensitive information about those who are subject to their collection, including age, gender, ethnicity, socio-economic status, health conditions, and more.  This information can be utilized in applications with pernicious, pervasive effects, including some which are "threatening or discriminatory[.]"[63]

60.      Despite this, in June 2024, "404 Media reported that … AU10TIX[] left login credentials exposed online for more than a year, allowing access to [] very sensitive user data."[64] This led to industry condemnation of Au10tix's business practices.  "If there's one type of company you definitely don't want to see left vulnerable to hackers it's an identity verification service with access to photo ID documents like driver's licenses – but that's exactly what appears to have happened with AU10TIX. … The company claims that no personal data was obtained, but given that the credentials were shared in Telegram channels used by hackers, and have worked for more than a year, this seems questionable."[65]  "'My personal reading of this situation is that

---

[63] https://www.nytimes.com/2021/09/12/opinion/voice-surveillance-alexa.html?referringSource=articleShare.

[64] https://www.eff.org/deeplinks/2024/06/hack-age-verification-company-shows-privacy-danger-social-media-laws.

[65] https://9to5mac.com/2024/06/27/identity-verification-company-au10tix/

[Au10tix] was entrusted with people's identities and it failed to implement simple measures to protect people's identities and sensitive ID documents,' Mossab Hussein, the chief security officer at cybersecurity firm spiderSilk who originally noticed the exposed credentials, said."[66]

61.     BIPA confers on Plaintiff and all other similarly situated Illinois residents a right to know of and make informed decisions concerning such risks inherent to the collection and storage of biometrics.

### F.     Plaintiff Paul McLeod's Experience

62.     Plaintiff McLeod interacted with Defendant's software while located in Illinois, in or around March 2020, within an online marketplace called Fiverr – which is one of Defendant's many clients.  Plaintiff McLeod provided a photo of his Illinois driver's license to Defendant so that "information [] obtained from [his] driver's license [could be used] to identify [him] or prove [his] age [as] the holder of the license, [] in the course of a commercial transaction[.]"  *See* 15 ILCS 335/14D(a); 625 ILCS 5/6-117.1(a).  Specifically, Plaintiff provided the readable text on the face of his Illinois driver's license because he wished to become an "Identity Verified" member of Fiverr.[67]

63.     Once Defendant's AI finished Plaintiff McLeod's discrete onboarding, authentication, identification, and/or age verification transaction – allowing Plaintiff McLeod to become an "Identity Verified" member of Fiverr – "the course of [Plaintiff McLeod's] commercial transaction" was complete.  *See* 15 ILCS 335/14D(a); 625 ILCS 5/6-117.1(a).

---

[66] https://www.engadget.com/an-id-verification-service-that-works-with-tiktok-and-x-left-its-credentials-wide-open-for-a-year-171258438.html

[67] https://help.fiverr.com/hc/en-us/articles/13127850435345-Verify-your-identity.

64.     Still, and despite the IDLA's clear restrictions, (*see* 625 ILCS 5/6-117.1(a)), Defendant proceeded to use Plaintiff's Information (the readable text on the face of Plaintiff McLeod's Illinois driver's license) for an unrelated, unpermitted purpose: to improve Defendant's own products and services.  That is, Defendant used Plaintiff's Information as "training data" for Au10tix's machine learning and/or artificial intelligence algorithms.

65.     Defendant's conduct does not fall within any of the exceptions delineated by the Illinois Driver's License Act.

66.     Au10tix never requested – nor did Plaintiff ever provide – express consent (written or otherwise) to: Au10tix's use of the Information for purposes unrelated to the transactions in which it was obtained; Au10tix's use of the Information as "training data," specifically; or Au10tix's privacy-related policies.

67.     By using Plaintiff's Information for "purposes unrelated to the transaction in which it was obtained," 15 ILCS 335/14D(a); 625 ILCS 5/6-117.1(a), Defendant invaded Plaintiff's statutorily protected right to privacy in his Information and harmed Plaintiff.

68.     In addition to providing a photo of the front of his Illinois driver's license, Plaintiff McLeod provided a photo of his face to Defendant through one of Au10tix's clients, Fiverr.

69.     Thus, Au10tix collected, captured, and/or otherwise obtained Plaintiff McLeod's face geometry and related biometric information.  Once Plaintiff McLeod provided a photo of his face, Defendant's proprietary software extracted (collected, captured, or otherwise obtained) Plaintiff's biometric face geometry by scanning Plaintiff's face.  Defendant's proprietary software also created a set of biology-based measurements used to identify Plaintiff.

70.     Au10tix did not, at any point during Plaintiff McLeod's interactions with it or its

32

software, request – nor did Plaintiff ever provide – informed written consent (including to the Au10tix "Biometric Data Policy") concerning his biometrics. *See* 740 ILCS 14/15(b)(3).

71. By collecting Plaintiff's unique biometrics without his consent, written or otherwise, Defendant invaded Plaintiff's statutorily protected right to privacy in his biometrics.

## CLASS ALLEGATIONS

72. **Class Definition**: Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of the following classes of similarly situated individuals (collectively, the "Classes"):

> All Illinois residents who uploaded a photograph of their Illinois driver's license to Defendant. ("Information Class").

> All Illinois residents who had their facial geometry captured, collected, possessed, received, stored, otherwise obtained and/or used, by Defendant in Illinois. ("Biometrics Class").

73. The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

74. **Numerosity**: Members of the Classes are so numerous that their individual joinder is impracticable. On information and belief, members of the Classes number in the thousands. The precise number of the Classes' members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Further, the size and relatively modest value of the claims of the individual members of the Classes renders joinder impractical.

33

Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's records.

75. **Commonality and Predominance**: Common and well-defined questions of fact and law exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, but are not limited to, the following:

(a) whether Defendant used information obtained from Plaintiff's and Information Class Members' Illinois drivers' licenses for purposes unrelated to the respective transactions in which said information was obtained, including but not limited to as "training data." *See* 625 ILCS 5/6-117.1(a);

(b) whether Plaintiff and Information Class Members gave express permission for Defendant to use the information to improve Defendant's own products and/or services, by employing the information as "training data" for Defendant's machine learning and/or artificial intelligence algorithms. *See* 625 ILCS 5/6-117.1(c);

(c) whether Defendant collected, captured, or otherwise obtained Plaintiff's and the Biometrics Class's biometric identifiers or biometric information; *See* 740 ILCS 14/15(b); 740 ILCS 14/15(b)(3);

(d) whether Defendant received written consent from Plaintiff and Biometrics Class Members for the collection of their biometric identifiers or information. *See* 740 ILCS 14/15(b)(3);

(e) whether Defendant used Plaintiff's and the Biometrics Class's biometric identifiers or biometric information to identify them;

(f) Whether the foregoing practices violate the IDLA or BIPA, and;

(g) whether Defendant's violations of the BIPA were committed intentionally, recklessly, or negligently.

76. **Adequate Representation**: Plaintiff has retained competent counsel experienced in prosecuting complex consumer class actions. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff and his counsel are able to fairly and adequately represent and protect the interests of the Classes because their interests do not conflict with the interests of the class members that Plaintiff seeks to represent. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional class representatives to represent the Classes or additional claims as may be appropriate.

77. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Moreover, even if every member of the Classes could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for inconsistent or contradictory judgments, and it would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Classes. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent

adjudication of the liability issues. Plaintiff anticipates no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with the IDLA and BIPA.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation Of 625 IlLCS 5/6-117.1
### Misuse Of Information Obtained From Illinois Drivers' Licenses
### (On Behalf of Plaintiff and the Information Class)

78. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79. Plaintiff brings this claim individually and on behalf of the members of the proposed Information Class against Defendant.

80. 625 ILCS 5/6-117.1(a) mandates that:

> When information is obtained from a driver's license to identify or prove the age of the holder of the license, or in the course of a commercial transaction, that information may be used only for purposes of identification of the individual or for completing the commercial transaction in which the information was obtained, including all subsequent payment, processing, collection, and other related actions. Information obtained from a driver's license may not be used for purposes unrelated to the transaction in which it was obtained[.]

81. Defendant failed to comply with this IDLA mandate.

82. Thousands of Information Class Members have provided photographs of their respective Illinois drivers' licenses to Defendant, so that Defendant could use the readable text on the face of said Illinois driver's licenses "to identify or prove the age of the holder of the license, or in the course of a commercial transaction[.]" 625 ILCS 5/6-117.1(a).

83. Once Defendant finished the discrete onboarding, authentication, identification, and/or age verification transactions of particular license holders, "the course of [these] commercial transaction[s]" was complete. *See id.*

84.     Still, and despite the IDLA's clear restriction that "[i]nformation obtained from a driver's license may not be used for purposes unrelated to the transaction in which it was obtained," *id.*, Defendant proceeded to use Class Members' information obtained from a driver's license "for purposes unrelated to the transaction in which it was obtained[.]" *See id.*

85.     Namely, as outlined above and as set out by Defendant's own "End User License Agreement"; "Data Protection Addendum"; and "Biometric Data Policy," Defendant uses the readable text on the face of Information Class Members' Illinois driver's licenses for purposes (improving Defendant's own products and/or services, by employing the information as "training data" for Defendant's machine learning and/or artificial intelligence algorithms) unrelated to the transactions in which the information was obtained (onboarding, authenticating, identifying, and/or age verifying individual Information Class Members).

86.     Defendant's conduct does not fall within any of the exceptions delineated by the Illinois Driver's License Act.

87.     Information Class Members were harmed by Defendant's use of their Information for purposes unrelated to the transactions in which the Information was obtained (Information Class Members' own onboarding, authentication, identification, and/or age verification transactions). If Defendant's "training data" were to fall into the wrong hands, by data breach or otherwise, individuals to whom the Information at issue belongs could have their identities stolen or their financial and/or other highly personal accounts breached and used for nefarious purposes. Despite this, in June 2024, "404 Media reported that … AU10TIX[] left login credentials exposed online for more than a year, allowing access to [] very sensitive user data."[68]

---

[68] https://www.eff.org/deeplinks/2024/06/hack-age-verification-company-shows-privacy-danger-social-media-laws. *See also* https://www.404media.co/id-verification-service-for-tiktok-uber-x-exposed-driver-licenses-au10tix/; https://9to5mac.com/2024/06/27/identity-verification-company-au10tix/ ("If there's one type of company you definitely don't want to see left vulnerable to hackers it's an identity verification service with access to photo ID

Additionally, Information Class Members were deprived of the ability to control (i.e., protect or monetize, at their own discretion) their Information.

88.     On behalf of himself and the Information Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Information Class by requiring Defendant to comply with the IDLA's requirements for the use of information obtained from a driver's license; (3) statutory damages of $250 for each violation of the IDLA pursuant to 625 ILCS 5/6-117.1(b); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 625 ILCS 5/6-117.1(b).

**SECOND CAUSE OF ACTION**
**Violation of 740 ILCS 14/15(B)**
**Failure to Obtain Informed Written Consent and Release**
**Before Obtaining Biometric Identifiers or Information**
**(On behalf of Plaintiff and the Biometrics Class)**

89.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

90.     Plaintiff brings this claim individually and on behalf of the members of the proposed Biometrics Class against Defendant.

91.     BIPA § 15(b) makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first … receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative."  740 ILCS 14/15(b); 740 ILCS 14/15(b)(3).

---

documents like driver's licenses – but that's exactly what appears to have happened with AU10TIX. … The company claims that no personal data was obtained, but given that the credentials were shared in Telegram channels used by hackers, and have worked for more than a year, this seems questionable."); https://www.engadget.com/an-id-verification-service-that-works-with-tiktok-and-x-left-its-credentials-wide-open-for-a-year-171258438.html ("'My personal reading of this situation is that an ID Verification service provider was entrusted with people's identities and it failed to implement simple measures to protect people's identities and sensitive ID documents,' Mossab Hussein, the chief security officer at cybersecurity firm spiderSilk who originally noticed the exposed credentials, said.").

92. Defendant failed to comply with this BIPA mandate.

93. Defendant Au10tix Ltd. is a limited company, it does business in Illinois, and thus it is a "private entity" under BIPA. *See* 740 ILCS 14/10.

94. Plaintiff and the Biometrics Class Members are individuals who have had their "biometric identifiers" collected, captured, and/or otherwise obtained by Defendant, as explained in detail above. *See* 740 ILCS 14/10.

95. Plaintiff's and the Biometrics Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

96. Defendant collected, captured, and/or otherwise obtained Plaintiff's and the Biometrics Class's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

97. By collecting, capturing, and/or otherwise obtaining Plaintiff's and the Biometrics Class's biometric identifiers and biometric information as described herein, Defendant violated Plaintiff's and the Biometrics Class's rights to privacy in their biometric identifiers and/or biometric information as set forth in BIPA § 15(b).

98. On behalf of himself and the Biometrics Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Biometrics Class by requiring Defendant to comply with BIPA § 15(b)'s requirements for the collection, capture, and/or obtainment of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for

each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys'

fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of himself and the proposed Biometrics Class,

respectfully requests that this Court enter an Order:

(a) Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as Class Counsel;

(b) Declaring that Defendant's actions, as set out above, violate 625 ILCS 5/6-117.1 (the "Illinois Driver's License Act" or "IDLA");

(c) Awarding statutory damages of $250.00 for each of Defendant's violations of the IDLA, pursuant to 625 ILCS 5/6-117.1(b);

(d) Declaring that Defendant's actions, as set out above, violate 740 ILCS 14/1 *et seq.* (the "Illinois Biometric Information Privacy Act" or "BIPA");

(e) Awarding statutory damages of $5,000.00 for each and every intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000.00 for each and every violation pursuant to 740 ILCS 14/20(1) if the Court finds that Defendant's violations were negligent;

(f) Awarding injunctive and other equitable relief as is necessary to protect the interests of the Information Class, including, *inter alia*, an Order requiring Defendant to use Illinois driver's license information in compliance with the IDLA;

(g) Awarding injunctive and other equitable relief as is necessary to protect the interests of the Biometrics Class, including, *inter alia*, an Order requiring Defendant to collect, capture, and/or obtain biometric identifiers and/or biometric information in compliance with BIPA;

(h) Awarding Plaintiff and the Classes their reasonable attorneys' fees and costs and other litigation expenses pursuant to 625 ILCS 5/6-117.1(b) and 740 ILCS 14/20(3);

(i) Awarding Plaintiff and the Classes pre- and post-judgment interest, to the extent allowable; and

(a) Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable.

Dated:  November 5, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*

Philip L. Fraietta (ARDC No. 6337165)
Matthew A. Girardi
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com
        mgirardi@bursor.com

*Counsel for Plaintiff and the Putative Classes*